**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**WESTERN DIVISION**

| | | |
|---|---|---|
| John Andrew Sihocky | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 17 CV 50001 |
| | ) | Magistrate Judge Iain D. Johnston |
| Nancy A. Berryhill, Acting | ) | |
| Commissioner of Social Security,[1] | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff John Andrew Sihocky was a construction worker for a number of years. In

December 2005, while working on a masonry job, he fell through an unsecured scaffolding and

injured his back. He was then 40 years old. This injury led to ongoing back pain that may have

been caused more by a latent degenerative disc disease rather than from the injury itself.  Except

for a few stints working as a construction flagger, a less physically demanding job, plaintiff has

not been able to work since the accident. In May 2013, he applied for disability benefits.

In July 2015, an administrative law judge ("ALJ") denied plaintiff's claim, finding that

he could do light work. The ALJ found plaintiff's testimony not credible primarily because, in

the ALJ's opinion, the objective medical evidence did not "fully corroborate" the allegations of

pain. R. 26. Much of the evidence the ALJ considered was developed as part of a parallel and

protracted workers' compensation case. One key piece of evidence, for example, was a May

2006 functional capacity evaluation ("FCE") concluding plaintiff could work full-time. The ALJ

relied heavily on the FCE, and also on the opinions from several doctors who were hired in the

---

[1] Nancy A. Berryhill has been substituted for Carolyn W. Colvin. Fed. R. Civ. P. 25(d).

workers' compensation case to provide "independent medical examinations."[2] The ALJ favored

these opinions and rejected a contrary opinion from plaintiff's orthopedist, Dr. Steven M.

Mardjetko, who began treating plaintiff in March 2010 and was still treating him at the time of

the hearing. Although Dr. Mardjetko never submitted a formal opinion, he made statements

plaintiff now relies on to prove he was disabled. In particular, Dr. Mardjetko stated in a March

2012 letter that plaintiff would be "essentially unemployable except at maybe a sedentary job

level." R. 428. More broadly, Dr. Mardjetko believed that plaintiff's pain was serious and

intractable enough that he should undergo a complicated three-level fusion surgery. The ALJ's

main reason for rejecting Dr. Mardjetko's opinion was that, according to the ALJ, Dr.

Mardjetko's statements were "financially motivated." R. 35; R. 36 ("Dr. Mardjetko's desire to

have [plaintiff's] proposed surgery covered by insurance").

The above summary is a brief and partial summary of a lengthy medical record, which

contains treatment notes and reports from a number of doctors over a nine-year span. But this

summary is sufficient to set the table for plaintiff's first and primary argument. Plaintiff argues

that the financial motivation rationale was factually unsupported and legally questionable. This

Court agrees.

As a factual matter, the ALJ's theory relies mostly on attenuated inferences combined

with one ambiguous statement from Dr. Mardjetko. The ALJ stated that Dr. Mardjetko "initially

recommended against" the fusion surgery in 2010 (or at least was then "equivocal" about it), but

"acquiesced" several years later based on plaintiff's "requests" to have surgery. R. 31, 34. To the

extent that the Court understands this theory (and the Court is not sure it does)[3], the ALJ

---

[2] These included Dr. Marc Soriano (2006), Dr. Jonathan Citow (2007), Dr. Carl Graf (2011), and Dr. Charles Slack (2014).

[3] The theory is bizarre on a number of levels. For example, the theory is premised upon Plaintiff undergoing a risky and invasive surgery, which in theory if successful, would make him less likely to qualify for disability benefits, all

believed that Dr. Mardjetko suspiciously changed his mind such that his first decision in 2010

represented an unbiased assessment; whereas, his later recommendation was tainted by the desire

for surgical fees and, perhaps also, by plaintiff's desire for disability benefits. If taken to its

natural and most extreme conclusion, this theory lodges a strong accusation of unprofessionalism

against Dr. Mardjetko.[4]

The one specific piece of evidence that the ALJ cited to as indirect support for this theory

was an observation the ALJ culled from Dr. Mardjetko's office notes. Set forth below is the

ALJ's explanation:

> In October 2011, Dr. Mardjetko was awaiting insurance approval to proceed. He
> noted that the claimant looked "substantially stronger and more fit than he did
> when first evaluated" (Exhibit 5F/4).

R. 31. The ALJ used this quotation—"substantially stronger and more fit"—to support an

improvement rationale, which differed from plaintiff's and Dr. Mardjetko's view that plaintiff's

condition was deteriorating or at least not improving. (Of course, there is no medical opinion to

support this rationale.) The ALJ reasoned that the alleged improvement undermined the surgery

recommendation. However, the ALJ's reliance on this one observation is weakened by the fact

that the ALJ took it out of context. Set forth below is a longer, and more balanced, excerpt from

these same treatment notes:

> The patient presents to us with a posttraumatic discogenic lumbar pain syndrome. I
> have been following him for quite a while. He started off as a gentleman who
> weighed approximately 275 pounds, and he has lost 40 pounds. He is still hanging
> right around 225 to 227 pounds. He looks substantially stronger and more fit than
> he did when first evaluated by me.

---

to ultimately receive a few hundred dollars a month in benefits. Additionally, this Court cannot count the number of
times it has read ALJ decisions that criticize and then discount the credibility of disability applicants for only
engaging in conservative treatment and not undergoing surgery. Applying the ALJ's theory here results in a classic
"heads-I-win-tails-you-lose" decision for disability applicants.

[4] Perhaps the ALJ believed that the desire for fees only influenced the doctor at a subconscious level and was not
accusing him of intentionally manipulating his diagnosis to reach a pre-determined conclusion.

> *The thing that bothers me about him is that his symptoms just continue to persist.* He seems like a very straight-shooting kind of guy and his pain is clearly discogenic pain. It is mechanical in nature and increases as he increases his activities. He feels that it definitely impedes his ability to enjoy life and clearly has interrupted any opportunity for him to seek out gainful employment.

R. 430 (emphasis added). As this excerpt makes clear, Dr. Mardjetko believed that, despite the improvement in appearance, plaintiff was still suffering from ongoing pain. Also, the comment about plaintiff appearing fit is related to the recent and substantial weight loss.

A contrary theory offered by plaintiff is that Dr. Mardjetko was simply being prudent in not initially recommending surgery. Under this theory, which would appeal to William of Occam and most people of ordinary common sense, the doctor simply decided to first try conservative measures and then, after those measures failed and after the doctor had established a longitudinal history with plaintiff, the doctor recommended surgery.[5] It is true that there was a disagreement among the doctors about whether this particular surgery was advisable because of uncertainty about whether it would alleviate the pain and because of the risks associated with the surgery itself. But insofar as this Court can determine, no doctor ever suggested that Dr. Mardjetko's interpretation was not a reasonable medical determination or that it was motivated by non-medical considerations. In the meantime, plaintiff continued to report that he was still experiencing pain. These facts suggest that Dr. Mardjetko, rather than being either a trigger-happy surgeon or a passive agent of plaintiff's desires, as the ALJ suggested, was proceeding in measured steps.

Despite the absence of concrete evidence supporting the theory, it is still possible that Dr. Mardjetko was motivated by financial considerations, but this general suspicion could be

---

[5] After their first meeting, Dr. Mardjetko wrote the following: "We would first recommend getting him back into an aggressive physical therapy program for diskogenic pain, to also work on an aerobic conditioning program that will help him lose weight, and to see if getting in better physical shape helps with some of his symptoms. He might also try a brace to help stabilize his low back." R. 615. Two years later, the doctor stated as follows: "we have tried everything and this gentleman has failed to improve with the usual measures." R. 428.

directed at almost any doctor. For this reason, several district courts have rejected this type of reasoning. *See Baizer v. Berryhill,* 2017 WL 1208440, *6 (N.D. Ill. Apr. 3, 2017) ("[T]he ALJ offers no support for his contention that the opinion of Dr. Kim may have been biased because it was given during Plaintiff's worker's compensation claim. Indeed, an ALJ's mere conjecture of a sympathetic response is not an acceptable basis for ignoring a treating physician's opinion."); *Beason v. Astrue*, 2009 WL 1064911, *5 (C. D. Ill. Apr. 17, 2009) ("[A]ny doctor will gain financially if a patient pays his bills. To reject a physician's opinions on the basis that he or she may gain financially if the claimant succeeds in obtaining social security benefits and therefore might be better able to pay their medical bills would effectively eliminate a claimant's ability to establish his case. In the absence of other evidence that Dr. Maurer had an ulterior motive for her opinions, the Court concludes that this suggestion does not constitute a basis for rejecting Dr. Maurer's opinions.").

Here, even if the ALJ were justified in questioning Dr. Mardjetko's motives, then the ALJ should have applied the same degree of suspicion to the reports from the other doctors who arguably had similar biases. In fact, at the start of her analysis, the ALJ seemed to be drawing just such a conclusion, stating that the "voluminous medical records and opinions expressed therein" all were "produced specifically" to address issues in the workers' compensation case, a case that the ALJ described as being "protracted." R. 34. Although the ALJ made this general observation, the ALJ only applied it to discredit plaintiff's doctor, while at the same time accepted at face-value the evaluations procured by the insurance carrier. This is a clear case of cherry-picking. *Sharp v. Colvin*, 2016 WL 3568843, *3 (N.D. Ill. July 1, 2016) ("another instance of cherry-picking is the fact that the ALJ did not apply the same standards when analyzing the opinions of the two testifying doctors"); *Taylor v. Colvin*, 2015 WL 5009729, *7

5

(N.D. Ill. Aug. 21, 2015) ("As a basic point of fairness, the ALJ should strive to apply the same criteria across the board.").

For all the above reasons, the Court finds that the ALJ's reliance on the financial-profit rationale was improper. A natural question arises as to whether this error is harmless. Although the Government has not formally made such an argument, it has noted that the ALJ also offered other grounds for the decision. This is true in a general sense, but the Court finds that this one error nonetheless justifies remand because the ALJ herself elevated this rationale above the others by referring to it as the "greatest consideration" for rejecting the opinion of plaintiff's treating physician. R. 36. The ALJ also referred to this rationale several other times in the decision. Thus, there is no doubt about the importance it played in the decision.

Although the Court finds that a remand is warranted based on the above argument, plaintiff has raised additional concerns and arguments reinforcing this conclusion. The Court will briefly comment on them. First, plaintiff complains that the ALJ failed to acknowledge his work history when concluding that he was essentially malingering to avoid work. As plaintiff argues, the Seventh Circuit has stated that a claimant with a "good work history" is "entitled to substantial credibility." *Stark v. Colvin*, 813 F.3d 684, 689 (7th Cir. 2016) (quoting from earlier Seventh Circuit cases); *see also Pierce v. Colvin*, 739 F.3d 1046, 1051 (7th Cir. 2014) ("[A] claimant's dogged efforts to work beyond her physical capacity would seem to be highly relevant in deciding her credibility and determining whether she is trying to obtain government benefits by exaggerating her pain symptoms."). Although not dispositive by itself, this factor still should have been acknowledged. As plaintiff notes, he had been working consistently since 1983. Dkt. #15 at 5.

6

Second, as noted above, the ALJ relied heavily on the FCE prepared five months after the scaffolding accident. Plaintiff complains that this document was prepared in 2006, over nine years before the ALJ's decision. As plaintiff notes, one of his early doctors, Marie Walker, specifically noted that the FCE conclusions might need to be revised later as plaintiff's condition and work attempts were taken into account. Given the importance that the ALJ placed on this one document, there is a good argument that it should have been updated. In fact, at one point in the decision, the ALJ seemed to agree with this conclusion, ambiguously stating the following: "Although an updated FCE has been recommended, the claimant has not proceeded as recommended[.]" R. 34. It is not clear who made this recommendation, nor why plaintiff allegedly did not proceed. However, after reviewing the record, this Court agrees that an updated FCE would be helpful, especially since an ongoing point of disagreement is whether plaintiff's condition changed since 2006.

Third, plaintiff criticizes the ALJ for playing doctor in analyzing the medical findings and reports. The ALJ did not call an impartial medical expert at the hearing, and the ALJ did not rely on any specific reasoning from the State Agency opinions. At the same time, the ALJ's credibility analysis relied heavily—arguably exclusively—on the conclusion that the objective medical evidence did not "fully" corroborate plaintiff's pain allegations. However, Social Security Regulation 96-7p(4) provides that "an individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence." Here, there are a number of instances where the ALJ violated this principle by conducting a layperson analysis of various doctor findings and medical tests. *Moon v. Colvin*,

763 F.3d 718, 722 (7th Cir. 2014) (ALJs should "rely on expert opinions instead of determining

the significance of particular medical findings themselves").

Fourth, the ALJ found that plaintiff should have engaged in more conservative measures

before considering surgery. Specifically, the ALJ stated that plaintiff "has not explored

multidisciplinary pain management or alternative modalities such as acupuncture, osteopathic

manipulation, yoga, or massage." R. 35. But this assessment ignores much evidence in the

record, from multiple doctors including Dr. Mardjetko, confirming that plaintiff had tried various

conservative measures.[6] Moreover, in even the ALJ's narrative of the medical visits, she noted

several of these treatments. *See* R. 29 (noting that plaintiff "remained in aqua therapy and

attended 37 treatments through discharge July 1, 2010."). It is not clear how the ALJ reconciled

these competing narratives. More pointedly, it borders on nitpicking to fault plaintiff for not

trying yoga when he (among other things) attended 37 aqua therapy sessions. The Government

wisely does not even attempt to defend this portion of the decision. *See* Dkt. #14 at 5.

At the same time, there are still some valid questions that will need to be explored on

remand about the nature and consistency of plaintiff's treatment. For example, as the ALJ noted,

there was a significant treatment gap of about three years. However, an ALJ cannot "rely on an

uninsured claimant's sparse treatment history to show that a condition was not serious without

exploring why the treatment history was thin." *Pierce*, 739 F.3d at 1050. On remand, the ALJ

should inquire into this issue.

To conclude, the Court's primary concern is with the ALJ's dismissal of Dr. Mardjetko's

opinions on the questionable basis that he was biased by a financial motive. More broadly, as the

---

[6] *See, e.g.* R. 346 (Dr. Walker: plaintiff had "tried several different interventions at Neck to Back including trigger point injections, traction, electrical stimulation, massage, and ultrasound." and also had been "on Vicoprofen and soman, which [did] not seem to be alleviating his pain very well"); R. 530 (Dr. Slack: "The claimant has had extensive therapy, has attempted weight loss at the request of his treating physician, is a nonsmoker and appears to have realistic expectations regarding surgical intervention.").

ALJ herself noted, the evidence in this case was developed out of the parallel workers'

compensation case. This is one reason, among others, why the ALJ should call an impartial

medical expert at a new hearing to provide a more neutral, as well as a more current, assessment

of the medical evidence.

## CONCLUSION

For the foregoing reasons, plaintiff's motion for summary judgment is granted, the

government's motion is denied, and this case is remanded for further consideration.


Date:  April 10, 2018                         By:   _____
                                                    Iain D. Johnston
                                                    United States Magistrate Judge